**EPSTEIN, FITZSIMMONS, BROWN,**
**GIOIA, JACOBS & SPROULS, P.C.**
Andrew R. Jacobs (AJ-6271)
245 Green Village Road
P.O. Box 901
Chatham Township, New Jersey 07928
Telephone: (973) 593-4900
Facsimile:  (973) 593-0179

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
Fred T. Isquith, Esq. (FI-6782)
Gustavo Bruckner, Esq. (GB-7701)
270 Madison Avenue
New York, New York  10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ADAM LEVITT, On Behalf of Himself and All Others Similarly Situated, ) ) ) | CIVIL ACTION NO. |
| Plaintiff, ) ) ) | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. ) ) ) | |
| AVAYA, INC., DONALD K. PETERSON, GARRY K. MCGUIRE, SR., ) ) ) | |
| Defendants. ) ) | DEMAND FOR JURY TRIAL |

## INTRODUCTION

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon the investigation by plaintiff's counsel, except for those allegations pertaining to plaintiff, which are based upon personal knowledge. The investigation of counsel included, among other things, a review of relevant public filings by Avaya, Inc. ("Avaya" or the "Company") with the Securities and Exchange Commission ("SEC"), press releases issued by the Company, media reports about the Company, publicly-available trading data about the Company and a review of reports issued by analysts who followed Avaya.

1.    This is a federal securities class action on behalf of all purchasers of the publicly traded securities of Avaya, between October 5, 2004 and April 19, 2005, (the "Class Period"), against Avaya and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act" or the "Exchange Act").

2.    Avaya designs, builds and manages communications networks for more than one million businesses worldwide, including more than 90 percent of the Fortune 500®. The Reuters abridged business summary describes the Company as a provider of communications systems, applications and services that help enterprises transform their businesses by redefining the way they work and interact with their customers, employees, business partners, suppliers and others. Its product offerings include Internet Protocol, or IP, telephony systems; appliances, such as telephone sets; multi-media contact center infrastructure and applications in support of customer relationship management; unified communications applications and traditional voice communication systems. Avaya historically organized its business into four segments: enterprise communications group, small and medium business solutions, services and connectivity

solutions.

3.      Throughout the Class Period, Avaya represented to the investment community that it was a highly-successful communications network company, while concealing (1) that its new go-to-market model in the United States created disruption affecting its U. S. sales, and (2) as opposed to the Company's rosy financial projections, there was softness in the U.S. technology market further affecting U.S. sales and, (3) that the costs of its Tenovis GmbH & Co. KG ("Tenovis") acquisition far exceeded projections.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the  SEC [17 C.F.R. § 240.10b-5].

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Many of the acts and practices complained of herein occurred in substantial part in this District and Avaya maintains its corporate headquarters in this District.

## THE PARTIES

7.      Plaintiff Adam Levitt purchased Avaya stock at artificially inflated prices during the Class Period and has suffered damages as shown in the attached Certification.

8.      Defendant Avaya is incorporated under the laws of the State of Delaware, with its principal executive offices located at 211 Mount Airy Road, Basking Ridge, Bernards Township, Somerset County, New Jersey 07920.

9.      Defendant Donald K. Peterson ("Peterson") has served as Chairman of the Board, President and Chief Executive Officer of Avaya during all relevant periods.  During the Class Period, Peterson sold 100,000 shares of Avaya stock for $1,416,500 proceeds.

10.      Defendant Garry McGuire, Sr., ("McGuire") has served as Avaya's Chief Financial Officer and Senior Vice President, Corporate Development during all relevant periods. During the Class Period, McGuire sold 251,760 shares of Avaya stock for $3,772,094 in proceeds.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

11.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired the securities of Avaya during the Class Period and who suffered damages (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

12.      The members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's report filed on Form 10-Q with the SEC on February 8, 2005, Avaya had approximately 480,014,273 shares of common stock outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Avaya or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

13.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

14.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, financial condition and management of Avaya;

(c)     whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d)     whether the market prices of the Company's common stock was artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

(e)     whether the members of the Class have sustained damages and the proper measure of such damages.

16.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

17. The Class Period begins on October 5, 2004. On that date, Avaya issued a press release entitled, "Avaya to Purchase Tenovis, A Major European Provider of Enterprise Communications Systems and Services." The press release stated, in pertinent part, as follows:

> Avaya said after the acquisition is completed, it expects international revenues will account for about 40 percent of its total revenues, up from 25 percent today. The company's European revenues would nearly triple, growing from about 12 percent to about 30 percent of Avaya's global business. When fully integrated, Avaya expects Tenovis will add about one billion dollars in annual revenues to Avaya.

> "The acquisition of Tenovis significantly enhances Avaya's size and scale in Europe, and is a major step in Avaya's plan to grow its business globally," said Don Peterson, chairman and CEO, Avaya. "Tenovis brings Avaya an integrated sales and services organization and an extensive customer base in Europe. We have complementary businesses and strategies including a common understanding of the unique communications needs of the enterprise customer. We have a shared commitment to provide customers with a strong services capability as well as delivering to them the wide range of business benefits inherent in IP telephony solutions and applications."

> *     *     *

> Avaya noted the addition of Tenovis is the latest in a series of targeted moves designed to expand the company's portfolio and global reach. The company increased its small and mid-market distribution channels in the United States with the addition of Expanets earlier this year. Its recent acquisition of a majority interest in Tata Telecom Ltd., now renamed Avaya GlobalConnect Ltd., improves Avaya's market position in India and the Asia Pacific region. With the addition of Spectel, Inc., Avaya significantly strengthened its conferencing applications.

> *     *     *

> The company said the acquisition is expected to be accretive by $0.07 per share in fiscal year 2006, the first full year of combined results. Excluding non-recurring costs and start-up expenses of $0.05 per share, the acquisition is expected to be dilutive by $0.03

per share in fiscal year 2005. The transaction's impact on fiscal year 2005 results will include approximately nine months of Tenovis results; if a full year's results were included then the transaction would be breakeven in fiscal year 2005 excluding the non-recurring costs and start up expenses.

"Consistent with our corporate development framework, Tenovis is expected to have a positive financial impact within a short period of time, and we will continue to maintain our financial strength and flexibility," said Garry K. McGuire, chief financial officer, Avaya.

McGuire noted at the end of the third fiscal quarter, Avaya's cash position was $1.5 billion and its net cash** position was $939 million, while operating cash flow through the first nine months was $350 million. He said Avaya intends to continue its de-leveraging strategy so that after the acquisition closes, its total debt would be at or below its debt levels today.

18.    On October 26, 2004, Avaya issued a press release entitled, "Avaya Reports Fourth Fiscal Quarter and Fiscal 2004 Results." The press release stated, in pertinent part, as follows:

"Avaya's results this quarter cap a year of substantial accomplishment and progress," said Don Peterson, chairman and CEO, Avaya. "We capitalized on our market leadership in IP telephony and delivered accelerating product sales growth through the year. The U.S. continues to lead the transition to IP telephony and in the fourth quarter we had double-digit product growth in this key market, both sequentially and compared to last year.

Avaya said the fourth fiscal quarter revenues of $1.076 billion include $14 million resulting from a reversal of reserves for sales returns and allowances. The company reversed the reserve as a result of operational improvements over the past year. Fourth quarter operating income of $119 million includes $12 million as a result of the reversal. The reversal had a favorable impact of two cents per diluted share in the fourth fiscal quarter.

"Avaya's results this quarter cap a year of substantial accomplishment and progress," said Don Peterson, chairman and CEO, Avaya. "We capitalized on our market leadership in IP telephony and delivered accelerating product sales growth through the year. The U.S. continues to lead the transition to IP telephony and in the fourth quarter we had double-digit product growth in this key market, both sequentially and compared to last year.

"Our international product sales grew at a double-digit rate compared to last year and we took major steps to continue this momentum. Our announcement earlier this month of the planned acquisition of Tenovis will greatly enhance our presence in Europe, making us number three in market share in the region. This move closely follows the addition of Tata Telecom, now Avaya GlobalConnect, which expands our market opportunity in Asia."

*    *    *

### Highlights from Year

Since the end of the last quarter, Avaya made a number of corporate and product portfolio announcements:

The company signed a definitive agreement to acquire Tenovis GmbH & Co. KG, a major European provider of enterprise communications systems and services, from affiliates of Kohlberg Kravis Roberts & Co. After the acquisition is completed, Avaya expects its European revenues would nearly triple, growing from about 12 percent to about 30 percent of Avaya's global business. When fully integrated, Avaya expects Tenovis will add about one billion dollars to its annual revenues.

19.     On October 29, 2004, Avaya issued a press release entitled, "Avaya Comments on Outlook for Fiscal Years 2005 and 2006," in which it provided financial guidance for fiscal years 2005 and 2006.  The press release stated, in pertinent part, as follows:

Avaya said its operating margin goal for fiscal year 2005 is between 8.5 percent and 9 percent on fiscal 2005 revenues that are expected to grow by between 25 percent to 27 percent compared to fiscal year 2004 revenues of $4.055 billion. Operating margin for fiscal year 2004 was 7.6 percent. Avaya said the expected growth in fiscal 2005 revenues will come from its existing businesses and the impact of its acquisition of Spectel, its majority interest in Avaya GobalConnect (formerly Tata Telecom), and assuming a Jan. 1, 2005 close of its pending acquisition of Tenovis.

For fiscal year 2006 the company has an operating margin goal of between 10 percent and 12 percent.

Avaya reiterated its existing balance sheet goals of maintaining a strong net cash position and keeping debt at a level no higher than its debt level prior to the planned acquisition of Tenovis. The company also said its longer-term goals of improving its credit rating to investment grade, opportunistically de-leveraging its

balance sheet and maintaining a cash position of approximately one billion dollars remain.

20.   On November 18, 2004, Avaya issued a press release entitled, "Avaya Completes Acquisition of Tenovis," announcing that it had completed its acquisition of Tenovis.

21.   On January 25, 2005, Avaya issued a press release entitled, "Avaya Reports First Fiscal Quarter 2005 Results." The press release stated, in pertinent part, as follows:

> "Avaya's first fiscal quarter 2005 revenues increased 18 percent to $1.148 billion compared to revenue of $971 million in the first fiscal quarter of 2004. The revenue increase largely reflected the impact of recent acquisitions and favorable currency rates. Excluding these two items, revenues grew at double-digit rates in all regions except the United States where sales were essentially unchanged versus the year ago period.
>
> "We continue to improve our profitability with operating income rising 70 percent year-over-year," said Don Peterson, chairman and CEO, Avaya. "We completed the Tenovis acquisition, shipped our five millionth IP telephony line and substantially reduced our debt. Our first quarter results position us to meet our goals for the year."
>
> Avaya said its fiscal 2005 goals are to increase revenues between 25 and 27 percent compared to fiscal 2004 revenues of $4.055 billion, grow operating income by 40 percent compared to $311 million in fiscal 2004 and raise annualized operating margin to between 8.5 and 9 percent compared to 7.7 percent last year.*
>
> As a result of the Tenovis acquisition, which has a significant rental and managed services business, Avaya made changes and enhancements to its financial reporting:
>
> On a consolidated basis, the company now breaks out revenue into three line items — products, rental and managed services, and services — and provide costs for each of these three.
>
> On a segment level, the company groups businesses into two reporting units — Global Communications Solutions and Avaya Global Services — and provides a breakout of major revenue line items within each.
>
> The company also is providing more information on the geographic breakout of revenues and product revenue by channel.

22.     On February 24, 2005, Avaya issued a press release entitled, "Avaya Announces Completion of $400,000,000 Unsecured Revolving Credit Facility and Additional Debt Reduction." The press release continued, in pertinent part, as follows:

> Avaya Inc. today announced the successful completion of a new $400 million five-year unsecured revolving credit facility. The new facility replaces Avaya's existing $250 million secured credit facility, which would have expired in September 2005. The new facility was over-subscribed as commitments exceeded $600 million.
>
> The company also said it has reduced its secured floating rate notes outstanding by $112 million, or approximately 40 percent. After the reduction the balance is $171 million. Avaya assumed the secured floating rate notes with its acquisition of Tenovis.
>
> "We appreciate the confidence and support from our banking partners as this facility provides flexibility for Avaya to continue executing its growth strategy," said Garry K. McGuire, Chief Financial Officer and senior vice president, Corporate Development, Avaya. "The de-leveraging of our long-term debt, this new credit facility, and the removal of the bank group's security interest are all key steps in Avaya's long-stated financial strategy to restore its investment grade rating."

23.     The statements referenced above in ¶¶ 17-22 were each materially false and misleading when made because defendants failed to disclose and/or misrepresented the following adverse facts, which were known to defendants, or recklessly disregarded by them, at all relevant times:

(a)     the cost of the integration of Tenovis was much greater than represented and rather than being "accretive" to fiscal 2005 earnings or having a positive financial impact within a short period of time, the acquisition would, in fact, reduce Avaya's earnings by at least $.06 per share during fiscal 2005;

(b)     Avaya's changes in its delivery methods of products to market was creating severe disruptions in sales;

(c)     Avaya was experiencing a dramatic reduction of demand in its U.S. market; and

(d)     based on the foregoing, Avaya had no reasonable basis to project an increase in profits or an increase in revenues of 25-27% for fiscal 2005.

### The Truth Begins to Emerge

24.     On April 19, 2005, Avaya issued a press release entitled, "Avaya Reports Second Fiscal Quarter 2005 Results." The press release stated, in pertinent part, as follows:

> Avaya Inc., a leading global provider of business communications software, systems and services, today reported income from continuing operations of $36 million or seven cents per diluted share in the second fiscal quarter of 2005. These results include six cents of dilution related to the results of operations from the Tenovis acquisition. . .
>
> In the same quarter last year the company reported income from continuing operations of $103 million or 22 cents per diluted share. Included in the $103 million were one-time items that had a net favorable impact of $63 million or 13 cents per diluted share....
>
> Avaya's second fiscal quarter 2005 revenues increased 21 percent to $1.222 billion compared to revenue of $1.006 billion in the second fiscal quarter of 2004. The revenue increase reflected the impact of recent acquisitions and revenue growth outside of the United States. The company said U.S. product and services revenues declined year-over year. Avaya's overall IP product sales rose nearly 30 percent year-over year. Outside of the United States, IP product sales rose more than 50 percent compared to the year ago period.
>
> "Although our performance this quarter was not up to our expectations, we're confident in the opportunity in IP telephony and our competitive advantage," said Don Peterson, chairman and CEO, Avaya. "Three key factors affected our overall performance: our implementation of a new go-to-market model in the United States, which has created some disruption affecting U. S. sales, the impact of the Tenovis integration and early signs of potential softness in the U.S. technology market. We will take actions to manage our business, including a tighter focus on cost control, to meet these challenges, improve our performance in the United States and build on our strength in other markets."

*       *       *

### Outlook For The Year

> Avaya said it expects its performance in the second half will
> improve with sequential increases in the third fiscal quarter in
> revenues and profitability and with revenue growth and
> profitability accelerating in the fourth fiscal quarter. However, the
> company believes it will not meet its previously stated goals for
> growing revenues, operating income and operating margin in fiscal
> 2005.

25.     The investing public's reaction was swift and negative.  An analyst at J.P. Morgan

called the results "horrid" and cut its rating on the stock to "neutral" from "overweight." The

stock fell more than 25% on April 20, 2005, the single biggest loser on the NYSE, on extremely

heavy trading volume.

26.     · On April 19, 2005, *MarketWatch* issued an article entitled "Avaya's income falls;

issues warning." The article stated in pertinent part:

> Avaya fell well short of Wall Street's forecast. The company was
> expected to earn 17 cents a share on revenue of $1.29 billion,
> according to the consensus of analysts surveyed by Thomson First
> Call.
>
> While the company predicted business would pick up in the second
> half of the fiscal year, Avaya said it no longer believes it can meet
> its prior financial forecast.
>
> In January, the company projected that annual revenue would rise
> as much as 27 percent above 2004's level to as high as $5.14
> million.

### Undisclosed Adverse Information

27.     The market for Avaya common stock was open, well-developed and efficient at all

relevant times. As a result of these materially false and misleading statements and failures to

disclose, Avaya's common stock traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired Avaya common stock

relying upon the integrity of the market price of Avaya's common stock and market information relating to Avaya, and have been damaged thereby.

28.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Avaya's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

29.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Avaya's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Avaya and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

30.     Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

31.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Avaya, their control over, and/or receipt and/or modification of Avaya allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Avaya, participated in the fraudulent scheme alleged herein.

32.     Defendants were further motivated to engage in this course of conduct in order to (i) enter into a $400 million unsecured revolving credit facility on more favorable terms than it would have had the truth been known; and (ii) enable the Individual Defendants to sell over 350,000 shares of their personally held Avaya stock and thereby reap over $5 million in gross proceeds. The details of the Individual Defendants' stock sales are set forth in the chart below:

|  | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **Garry K. McGuire** | 11/1/2004 | 20,000 | $14.50 | $289,000 |
|  | 11/3/2004 | 111,760 | $14.500 | $1,620,520 |
|  | 12/15/2004 | 3,600 | $16.700 | $60,120 |
|  | 12/15/2004 | 3,000 | $16.690 | $50,070 |
|  | 12/15/2004 | 2,200 | $16.730 | $36,806 |
|  | 12/15/2004 | 1,900 | $16.600 | $31,540 |
|  | 12/15/2004 | 1,900 | $16.640 | $31,616 |
|  | 12/15/2004 | 1,800 | $16.630 | $29,934 |
|  | 12/15/2004 | 1,700 | $16.650 | $28,305 |
|  | 12/15/2004 | 1,600 | $16.740 | $26,784 |
|  | 12/15/2004 | 1,500 | $16.750 | $25,125 |
|  | 12/15/2004 | 1,400 | $16.660 | $23,324 |
|  | 12/15/2004 | 1,400 | $16.720 | $23,408 |
|  | 12/15/2004 | 1,100 | $16.680 | $18,348 |
|  | 12/15/2004 | 1,000 | $16.710 | $16,710 |
|  | 12/15/2004 | 700 | $16.590 | $11,613 |
|  | 12/15/2004 | 600 | $16.620 | $9,972 |
|  | 12/15/2004 | 600 | $16.610 | $9,966 |

| | | | | |
|---|---|---|---|---|
| | 12/15/2004 | 500 | $16.500 | $8,250 |
| | 1211512004 | 400 | $16.570 | $6,628 |
| | 12/15/2004 | 300 | $16.760 | $5,028 |
| | 12/15/2004 | 300 | $16.490 | $4,947 |
| | 12/15/2004 | 300 | $16.550 | $4,965 |
| | 12/15/2004 | 300 | $16.480 | $4,944 |
| | 12/15/2004 | 300 | $16.670 | $5,001 |
| | 12/15/2004 | 200 | $16.770 | $3,354 |
| | 12/15/2004 | 200 | $16.780 | $3,356 |
| | 12/15/2004 | 200 | $16.510 | $3,302 |
| | 12/15/2004 | 200 | $16.580 | $3,316 |
| | 12/15/2004 | 100 | $16.530 | $1,653 |
| | 12/15/2004 | 100 | $16.800 | $1,680 |
| | 12/15/2004 | 100 | $16.450 | $1,645 |
| | 12/15/2004 | 100 | $16.440 | $1,644 |
| | 12/15/2004 | 100 | $16.460 | $1,646 |
| | 12/15/2004 | 100 | $16.470 | $1,647 |
| | 12/15/2004 | 100 | $16.520 | $1,652 |
| | 12/15/2004 | 100 | $16.560 | $1,656 |
| | 1/3/2005 | 2,200 | $17.020 | $37,444 |
| | 1/3/2005 | 2,200 | $17.010 | $37,422 |
| | 1/3/2005 | 2,100 | $17.140 | $35,994 |
| | 1/3/2005 | 2,000 | $17.150 | $34,300 |
| | 1/3/2005 | 1,500 | $17.180 | $25,770 |
| | 1/3/2005 | 1,400 | $17.130 | $23,982 |
| | 1/3/2005 | 1,300 | $17.110 | $22,243 |
| | 1/3/2005 | 1,200 | $17.220 | $20,664 |
| | 11312005 | 1,000 | $17.070 | $17,070 |
| | 1/3/2005 | 1,000 | $17.090 | $17,090 |
| | 1/3/2005 | 1,000 | $17.160 | $17,160 |
| | 1/3/2005 | 1,000 | $17.040 | $17,040 |
| | 1/3/2005 | 1,000 | $17.000 | $17,000 |
| | 1/3/2005 | 1,000 | $17.050 | $17,050 |
| | 1/3/2005 | 800 | $17.200 | $13,760 |
| | 1/3/2005 | 800 | $17.190 | $13,752 |
| | 1/3/2005 | 800 | $17.120 | $13,696 |
| | 1/3/2005 | 800 | $17.030 | $13,624 |
| | 1/3/2005 | 700 | $17.170 | $12,019 |
| | 1/3/2005 | 600 | $16.990 | $10,194 |
| | 1/3/2005 | 500 | $17.290 | $8,645 |
| | 1/3/2005 | 500 | $17.100 | $8,550 |
| | 1/3/2005 | 400 | $17.080 | $6,832 |
| | 1/3/2005 | 400 | $17.350 | $6,940 |
| | 1/3/2005 | 400 | $17.340 | $6,936 |
| | 1/3/2005 | 400 | $16.960 | $6,784 |
| | 1/3/2005 | 300 | $17.330 | $5,199 |
| | 1/3/2005 | 300 | $17.360 | $5,208 |
| | 1/3/2005 | 300 | $17.270 | $5,181 |
| | 1/312005 | 300 | $17.210 | $5,163 |
| | 1/3/2005 | 300 | $16.980 | $5,094 |

| | | | | |
|---|---|---|---|---|
| | 1/3/2005 | 200 | $17.300 | $3,460 |
| | 113/2005 | 200 | $17.370 | $3,474 |
| | 1/312005 | 200 | $17.280 | $3,456 |
| | 1/3/2005 | 200 | $16.970 | $3,394 |
| | 1/3/2005 | 100 | $17.320 | $1,732 |
| | 1/3/2005 | 100 | $17.260 | $1,726 |
| | 1/3/2005 | 100 | $17.230 | $1,723 |
| | 1/3/2005 | 100 | $17.250 | $1,725 |
| | 113/2005 | 100 | $17.240 | $1,724 |
| | 113/2005 | 100 | $17.060 | $1,706 |
| | 113/2005 | 100 | $16.930 | $1,693 |
| | 2/1/2005 | 30,000 | $14.300 | $429,000 |
| | 3/1/2005 | 30,000 | $14.000 | $420,000 |
| **Total** | | 251,760 | | $3,772,094 |
| | | | | |
| **Donald K. Peterson** | 11/1/2004 | 50,000 | $14.200 | $710,000 |
| | 2/4/2005 | 50,000 | $14.130 | $706,500 |
| **Total** | | 100,000 | | $1,416,500 |
| **Grand Total** | | **351,760** | | **$5,188,594** |

### Applicability of Presumption of Reliance: Fraud on the Market Doctrine

33.     At all relevant times, the market for Avaya stock was an efficient market for the following reasons, among others:

(a)     Avaya's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Avaya filed periodic public reports with the SEC and the NYSE;

(c)     Avaya regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Avaya was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

34.    As a result of the foregoing, the market for Avaya's common stock promptly digested current information regarding Avaya from all publicly available sources and reflected such information in Avaya's stock price. Under these circumstances, all purchasers of Avaya's common stock during the Class Period suffered similar injury through their purchase of Avaya's stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

35.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Avaya who knew that those statements were false when made.

## LOSS CAUSATION

36.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Avaya's stock price and operated as a fraud or deceit on Class Period purchasers of Avaya stock by misrepresenting the

Company's business success and future business prospects. Defendants achieved this facade of success, growth and strong future business prospects by blatantly misrepresenting the Company's business prospects. Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Avaya stock fell precipitously as the prior artificial inflation came out of Avaya's stock price. As a result of their purchases of Avaya stock during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

37.     During the Class Period, the defendants presented a misleading picture of Avaya's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Avaya's business was not as healthy as represented, defendants caused Avaya to falsely represent demand from customers and forecasted earnings. During the Class Period, defendants repeatedly emphasized Avaya's successful integration of Tenovis.

38.     These false claims of strong future results and the successful integration of Tenovis caused and maintained the artificial inflation in Avaya's stock price throughout the Class Period and until the truth was revealed to the market.

39.     Defendants' false and misleading statements had the intended effect and caused Avaya stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $17.73 per share.

40.     On April 19, 2005, defendants were forced to publicly disclose that: (1) Avaya's "go-to-market" model had disrupted its sales; (2) its fiscal 2005 results would be worse than prior representations; and (3) the integration of Tenovis had not been nearly as successful as prior representations. These public revelations indicated that Avaya's fiscal 2005 financial results would be much worse than prior representations, that Avaya had failed to achieve the operational efficiencies represented through Tenovis and thus the Company's prospects for business success

and earnings growth for fiscal 2005 and beyond were severely diminished. As investors and the market became aware that Avaya's actual business prospects were poorer than represented, which had been obfuscated by defendants, the prior artificial inflation came out of Avaya's stock price, damaging investors.

41.     As a direct result of defendants' admissions and the public revelations regarding the truth about Avaya's previous representations and its actual business prospects going forward, Avaya's stock price plummeted 25%, on unusually high volume, falling from $10.69 on April 19, 2005 to $8.01 per share on April 20, 2005, a one day drop of $2.68 per share. This drop removed the inflation from Avaya's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about defendants' fraud and Avaya's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of up to $2.68 per share.

42.     The 25% decline in Avaya's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Avaya's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which Avaya's stock price fell 25% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, i.e., damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Avaya's stock price and the subsequent significant decline in the value of Avaya's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### For Violation of § 10(b) of the 1934 Act and Rule 10b-5
### Against all Defendants

43.    Plaintiff repeats and re-alleges ¶¶ 1-42 by reference.

44.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Avaya publicly traded securities during the Class Period.

46.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Avaya publicly traded securities. Plaintiff and the Class would not have purchased Avaya publicly traded securities at the prices they paid, or at all, if they had not been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

47.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Avaya publicly traded securities during the Class Period.

## COUNT II

### For Violation of § 20(a) of the 1934 Act
### Against All Defendants

48.    Plaintiff repeats and re-alleges ¶¶ 1-47 by reference.

49.    The Individual Defendants acted as controlling persons of Avaya within the meaning of § 20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Avaya, and their ownership of Avaya stock, the Individual Defendants had the power and authority to cause Avaya to engage in the wrongful conduct complained of herein.  Avaya controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Avaya are liable pursuant to § 20(a) of the 1934 Act.

50.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

51.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

52.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to F.R.C.P. 23;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 4, 2005
     Chatham Township, New Jersey

               **EPSTEIN, FITZSIMMONS, BROWN,**
               **GIOIA, JACOBS & SPROULS, P.C.**

               By:_____
                  Andrew R. Jacobs (AJ-6271)
               245 Green Village Road
               P.O. Box 901
               Chatham Township, New Jersey 07928
               Telephone: (973) 593-4900
               Facsimile:  (973) 593-0179

                   and

               WOLF HALDENSTEIN ADLER
                FREEMAN & HERZ LLP
               Fred T. Isquith, Esq. (FI-6782)
               Gustavo Bruckner, Esq. (GB-7701)
               270 Madison Avenue
               New York, New York  10016
               Telephone: (212) 545-4600
               Facsimile:  (212) 545-4653

               Attorneys for Plaintiff